Filed 8/22/22 In re A.R. CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | H049342 (Santa Clara County Super. Ct. No. 21JD026814) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES et al._x000D_ Plaintiffs and Respondents, v. C.G., Defendant and Appellant. | |

Two months after A.R.'s birth, the mother requested that A.R. be placed into protective custody. The juvenile court later sustained a petition filed by the Santa Clara County Department of Family and Children's Services (the Department) pursuant to Welfare and Institutions Code section 300, finding that A.R. came within the jurisdiction of the juvenile court. C.G., with whom A.R.'s mother had an ongoing relationship, believed he was the father. Paternity testing, however, later excluded him as the biological father, instead establishing E.S. as the biological father. Both C.G. and E.S. filed petitions seeking presumed parent status. The juvenile court ultimately found that C.G. was not a presumed parent, and instead found that E.S. was a presumed parent. In the alternative, the juvenile court also found that even if C.G. was a presumed parent, a three-parent finding was not appropriate and C.G. should nonetheless be excluded.

C.G. appeals, arguing that there was insufficient evidence to support the juvenile court's finding that he was not a presumed parent. He also argues that there was insufficient evidence that E.S. was a presumed parent, and therefore it was erroneous to make a three-parent finding. Finally, he contends that even if E.S. was properly considered a presumed parent, the trial court abused its discretion by not finding a three-parent finding to be warranted.

We conclude that the juvenile court's order finding C.G. was not a presumed parent was supported by substantial evidence.[1] Accordingly, we affirm the order.

## I. Background

### A. Factual Background

C.G. and the mother met in 2016. The two lived together in a tumultuous relationship marked by substance abuse, untreated mental health issues, and mutual verbal and physical violence. In early 2020, C.G. and the mother separated.

In February 2020, the mother began a relationship with E.S., and the two moved in together. The mother became pregnant. E.S. accompanied the mother to some of her prenatal appointments. At one such appointment at Stanford University, "the medical provider informed both [E.S.] and [the mother] that no heartbeat was found." The mother was told she may have had a miscarriage. Believing she was no longer pregnant, the mother stopped going to prenatal appointments. E.S. also believed the mother was not pregnant. In May 2020, E.S. and the mother separated.

C.G. and the mother reestablished their relationship. In November 2020, C.G. called an ambulance to take the mother to the hospital because of intermittent pain and fluid coming out of her vagina. C.G. was not allowed into the hospital initially.

---

[1] In light of this finding, we do not need to address C.G.'s other contentions on appeal.

The next day, A.R. was born.  After birth, the infant tested positive for methamphetamine, amphetamine, and opiates.  The mother called C.G. to report "that we had a child."  C.G. was shocked.  C.G. asked "an impulsive question," " 'Is [the child] mine?' "  The mother responded, "Yes, of course."  This was C.G.'s first child.  He was "super happy.  Very happy."

A.R. was in the hospital for "[a]bout two weeks."  C.G. slept overnight at the hospital in the same room as A.R. and the mother.  After A.R.'s birth, C.G. announced his birth on social media and identified A.R. as his son.

On the day of A.R.'s birth, based on the positive drug test, the Department received an initial referral of severe neglect and investigated.  Because the mother and C.G. were unaware of the pregnancy, the allegation of severe neglect was found to be inconclusive.  The mother and C.G. agreed to engage in voluntary family maintenance services.

In late December 2020, the mother was referred to residential substance abuse treatment at Parisi House on the Hill, where she could be treated while staying with A.R.

On January 8, 2021, C.G. tested positive for methamphetamine and amphetamine.  C.G. confirmed the use of these substances less than a week earlier.  C.G. agreed to a safety plan where visitation would be cancelled if C.G. was under the influence of substances.  On January 9, 2021, the mother reported that C.G. attempted to visit A.R. despite his positive test the day before. The mother cancelled the visit.

On January 20, 2021, the mother tested positive for methamphetamine and amphetamine.  She admitted to using methamphetamine four days earlier, and described the use as "an impulse."

On January 21, 2021, the social worker spoke with C.G. by phone, and he recounted recently being with the mother, when "she exhibited bizarre and inappropriate behavior."  According to C.G., he was in a vehicle with A.R. while the mother was driving.  The mother pulled the vehicle over after she received a phone call from the

social worker. The mother asked C.G. to be quiet so that the social worker would not know C.G. was with her. During the phone call the mother was "irritated" and "verbally insulted and blamed" C.G. for the couple's substance abuse and involvement with the Department. After the call, the mother began to speed and drive erratically. She "became increasingly agitated, impulsive and screamed, 'I'm going to kill us all. Keep that bastard. I'm tired of this,' " while C.G. sat in the back seat with A.R. The mother then began to accelerate and brake, causing A.R.'s head to swing. The mother pulled over and started crying on the side of the freeway. She then drove to C.G.'s house, snorted methamphetamine in front of C.G., and drove home with A.R. still in the vehicle. C.G. did not call the police or intervene in any way because he " 'didn't want her to get in trouble,' " and he thought " 'she might change.[']"

On January 26, 2021, and January 28, 2021, the mother twice absconded without permission from her residential treatment program at Parisi House on the Hill. Despite this, the program director allowed the mother to remain in the treatment program.

On February 1, 2021, the mother tested positive for methamphetamine and amphetamine. Due to the two prior absconding incidents and the positive drug test, the mother was discharged from the residential treatment program. The mother admitted to using methamphetamines while at the facility. Although she reported finding them " 'under the . . . facilities stairs during the weekend,' " her peers at the facility reported that C.G. "ha[d] been visiting the facility and supplying the mother with drugs."

After being discharged from the program, the mother requested that A.R. be placed into protective custody "because [she and C.G.] cannot provide for care and supervision of the child." A.R. was placed in the home of a foster mother.

On February 2, 2021, the social worker met with the mother. She described her history of substance abuse, and stated she did not begin to use methamphetamine until she met C.G. She reported instances of domestic violence perpetrated by C.G.

4

She stated she continued her relationship with C.G. because "she did not want [A.R.] to grow up without a father."

The social worker interviewed C.G. the same day. He appeared "with dilated pupils, rapid, and pressured speech." He admitted to using methamphetamine three days prior, but stated he was interested in substance abuse services and had been free of substances for three days. The social worker referred to A.R. by his name, and "[C.G.] said he did not know the child's name was [A.R.] because [the mother] kept [A.R.] away from him." C.G. stated he had last seen A.R. 15 days prior. On the issue of paternity, he "said he [was] open to taking a paternity test and regardless of the findings, he will continue to care for [A.R.] as his son." He specifically denied providing the mother with drugs while she was at the residential drug treatment program.

On February 3, 2021, the Department filed a petition under Welfare and Institutions Code section 300, subdivision (b), alleging that A.R. had suffered or was at substantial risk of suffering serious physical harm.

On February 4, 2021, at the detention hearing, the mother and C.G. appeared with appointed counsel. The court found that a prima facie showing had been made and that continued detention was necessary. The mother and C.G. were permitted a maximum of two hours twice per week of supervised visitation. The court also ordered a paternity test to determine if C.G. was A.R.'s biological father.

On March 5, 2021, the results of the DNA paternity test were reported. The results excluded C.G. from paternity and established he was not A.R.'s biological father. Despite the results, C.G. indicated he would still seek presumed parent status since he and A.R. had bonded since birth.

On March 17, 2021, E.S. contacted the Department stating that he believed he was A.R.'s biological father and requested paternity testing. He stated that he had recently become aware that the mother believed that he was A.R.'s biological father.

5

E.S. admitted to a history of addiction with alcohol, heroin, cocaine, and methamphetamine. He was arrested in June 2020 for driving under the influence of alcohol, and thereafter engaged in treatment services with the Salvation Army. E.S. was scheduled to graduate from the six-month program in May 2021. E.S. "proudly said he ha[d] maintained sobriety for 9 months" and "specifically described sobriety from methamphetamine [for] 9.5 months, cocaine for 10 month[s], heroin [for] 9 years . . . and alcohol since [his arrest]."

On May 4, 2021, E.S. filed a motion to establish presumed parent status. He stated that should DNA testing confirm that he is A.R.'s biological father, he "wants to have a relationship with him" and "to raise [A.R.] as his son." He also stated he was "willing to do whatever it takes to have [A.R.] in his care, including family reunification services." He reiterated that he was unaware of the mother's pregnancy, and like her, had believed the pregnancy ended in a miscarriage. Prior to the presumed miscarriage, he stated that he "worked two jobs to support mother during the early stages of her pregnancy and accompanied mother to several prenatal appointments." Paternity testing results later confirmed that E.S. was A.R.'s biological father.

E.S. was investigated by the Department. According to his pre-trial services case manager, E.S. was under electronic monitoring supervision and was " 'doing great.' " E.S.'s Salvation Army case manager reported that E.S. was "doing exceptionally well, appeared motivated and [was] aware of what 'he's supposed to be doing and when he should be doing it.' "

C.G. continued to make in-person visits to see A.R. at his foster home. According to reports of the visits, "[d]uring in person visits between [C.G.] and [A.R.], [C.G.] sings, talks and uses terms of endearment towards [A.R.]. [C.G.] pushed [A.R.] in the stroller while talking to him and [A.R.] responds to [C.G.] by cooing and making baby sounds. [A.R.] has been observed lifting his hands upward and [C.G.] becomes excited and believed [A.R.] reached out for him to pick [A.R.] up. [C.G.] brings toys during the

6

visitations. At times, [C.G.] requires prompting, guidance and coaching on how to change [A.R.'s] diaper, listen to cues, and feed [A.R.]." C.G. reported that he "provided financial, emotional, physical support for [A.R.] and met his basic needs of shelter, clothing and food." He also said "he provided material items such as [a] car seat, stroller, toys, clothes, blankets and diapers."

The foster mother supervised brief (five to 10 minute) video calls between A.R. and C.G., and between A.R. and E.S. She reported both C.G. and E.S. would call in the evening to wish A.R. " 'good night' " or call in the morning. During a home visit, the foster mother observed C.G. engage A.R. by singing and talking to him. A.R. responded "very positively" and was observed "smiling, laughing, reaching his hands out and cooing at [C.G.'s] voice." When A.R. hears C.G.'s voice on a video call "he immediately lights up" and is engaged with C.G. On one occasion, A.R. "became fussy because he was hungry." The foster mother left A.R. alone in his crib. C.G. told the foster mother that he would watch A.R. The foster mother noted that C.G. was able "to engage [A.R.] even when he was fussy and crying for the bottle and demonstrated patience during [A.R.'s] cries."

The foster mother also noted that E.S. called and engaged with A.R. during video calls. E.S. "is happy to see [A.R.] during video calls, however at times when [A.R.] becomes fussy or begins to cry, [the foster mother] noted [E.S.] would end the phone call so [she] could attend to [A.R.]." On one occasion, "when [A.R.] became fussy and cried [E.S.] told the [f]oster [m]other he would 'let you . . . handle that' and terminated the call." The foster mother also reported, on another call, that E.S. "commented during a video call that [A.R.] 'was not paying attention to me' and terminated the call." E.S. provided diapers and a rattle and offered to provide additional items as needed.

Supervised visits for both C.G. and E.S. continued through June and July 2021. On one particular visit, C.G. was physically affectionate and played with A.R., provided toys, fed him, and changed his diaper. C.G. rocked A.R. in his arms and played lullabies

on his phone. C.G. was reminded by the social worker to change A.R.'s diaper at the end of the visit. C.G. blew air in A.R.'s face and A.R. smiled and laughed.

On another visit, E.S. talked to A.R., fed him, changed his diaper and held him. A.R. responded by smiling and rocking back and forth when being held. E.S. showed A.R. a book. E.S. played music on his phone and took photographs of A.R. A.R. fell asleep in E.S.'s arm and E.S. laid him on the couch to sleep. E.S. positioned himself to prevent A.R. from falling.

### B. *Paternity Hearings*

At the initial paternity hearing on May 12, 2021, the mother testified that after A.R.'s birth she did not want to move in with C.G. because of the presence of marijuana and methamphetamines in his house. C.G. denied the presence of drugs in his house. C.G. testified that he bought supplies for A.R., including toys, formula, strollers, and diapers. C.G. stated that A.R. and the mother visited C.G.'s house during the day on occasion, and on one occasion stayed overnight. C.G. reported "[a]lways" going to A.R.'s doctor's appointments. Since A.R. was placed into foster care, C.G. has visited "twice a week for two hours, and . . . [has] not missed any appointments."

When asked whether he ever received a voluntary declaration of paternity during the first two weeks of A.R.'s life, C.G. testified he "never received any type of document." C.G. said he did try "to go and get a birth certificate with my name on it as the father, but we didn't go to do that because of personal things." C.G. elaborated that he was referring to a no contact restraining order that was in effect between him and the mother. He acknowledged being at the hospital despite the restraining order, however, and maintained he "would have . . . sign[ed] [a voluntary declaration of paternity at] any time."

At the next hearing on June 23, 2021, the juvenile court found that C.G. was a presumed parent. At the outset, the court noted the decision was "quite close in this case." The court explained: "The child was never literally in [C.G.'s] home, as the child

8

was in the hospital after birth. [C.G.] did testify, however, that he slept at the hospital for several weeks . . . with [A.R.], his baby. He claimed he went to several doctor's appointments. He did care for [A.R.] at visits, including changing his diaper at least one time and feeding him. He did not provide, I would say, prenatal care, as he didn't know that the mother was pregnant. He did take her to the hospital, but not because he knew she was pregnant at the time, but rather, for the benefit of her. He also, it appears, provided drugs to the mother while she was at House on the Hill, which would not seem to be in the baby's best interest. He also apparently let the mother drive with [A.R.] after he had watched the mother ingest methamphetamine."

The juvenile court concluded: "I will say while I'm not sure or I feel like it's a close case whether at the time or soon after [A.R.'s] birth [C.G.] could meet the standard, the fact is he did hold [A.R.] out. He did visit with him. Since this case began, he has been visiting consistently. The reports indicate he has now formed a bond with [A.R.]. So I do believe there is that parental relationship now, and I'm going to find that he is a presumed father under [Family Code section] 7611(d)."[2] The court added, however, "I do it with some hesitation."

The juvenile court turned to E.S.'s paternity claim. The court found that E.S. was the biological father based on the results of the DNA test. The court also found, based on the uncontested parentage motion and accompanying declarations, that E.S. met the standard to be a *Kelsey S.*[3] biological father. The court concluded, for those reasons, that E.S. was also a presumed parent.

---

[2] Unspecified statutory references are to the Family Code.

[3] In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 827, the California Supreme Court held that "due process entitles a biological father a meaningful opportunity to qualify as a presumed father." (*In re Jesusa V.* (2004) 32 Cal.4th 588, 601.) Under *Kelsey S.*, "[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a
(continued)

The court proceeded to hear argument on whether to make a three-parent finding. E.S. argued that as a *Kelsey S.* father, he should be considered "the equivalent of a statutorily presumed father because any other conclusion would render the *Kelsey S.* status meaningless." Addressing C.G.'s paternity claim, E.S. argued that while C.G.'s "commitment to [A.R.] is really admirable, he's not been involved in [A.R.'s] life for a substantial period of time." He noted that C.G.'s interactions with A.R. have been supervised and limited to a few hours a week, and that A.R. was only eight months old. He asserted that this was not the type of "well-developed, parent-child relationship that the legislature was really concerned about preserving when they created the provision for the courts to recognize three parents." E.S. noted that he had "been visiting with [A.R.] consistently" since the DNA test showed paternity, which authorized him to begin visitation. He also noted that he had engaged "in services and [was] very motivated to reunify with [A.R.]." He further noted that he "came forward as promptly as he could to assert his interest in having a relationship with [A.R.] and would have come forward sooner had he not been thwarted in his ability to do so." In sum, he requested that the court decline to make a three-parent finding.

C.G. argued that a *Kelsey S.* father was not the functional equivalent of a presumed parent under section 7611, subdivision (d). He noted that he was with A.R. in the hospital during the first two weeks of his life, and he had "made every effort before protective custody to see his child, was committed to his child, bought within his economic means supplies for the child, [and] executed parental care of the child." He also noted his participation in medical appointments, the mother's presence in his house "twice a week for hours at a time," the many photos of him and A.R., and his efforts

showing of his unfitness as a parent." (*Kelsey S.*, *supra*, at p. 849.) "While *Kelsey S.* was decided in the context of adoption, appellate courts have extended it to dependency proceedings." (*In re D.S.* (2014) 230 Cal.App.4th 1238, 1244.)

since protective custody to meet A.R.'s needs. He asserted it would be detrimental to A.R. to now remove the relationship from A.R.'s life. He acknowledged E.S.'s efforts, but asserted that while the efforts had been "excellent," the efforts were "new" and "not established."

At the conclusion of the hearing, the court proceeded to jurisdiction. The mother, E.S. and C.G. each waived their right to a trial and submitted the matter on the social reports and petition. The court found the allegations in the third amended dependency petition to be true and A.R. was made a ward of the court.

At the next hearing on July 23, 2021, the juvenile court indicated it had "a decision for you today that I think is going to be a little bit of a surprise." The court stated it had become "quite troubled" by its prior finding that C.G. was a presumed parent, and after further research, had concluded, "I made the wrong decision." Thus, the court stated, "I'm going to set aside that decision today and find that [C.G.] is not a [section] 7611(d) [presumed] father." The court emphasized that it was making its decision "based just on the facts that the Court had before it [at the last hearing]," and was "not making my reconsideration based on any new facts."

The juvenile court explained that C.G. had not "receive[d] the child into the home," and "therefore . . . cannot meet the standard for a [section] 7611(d) father." While C.G. "did testify that he slept [at the hospital], . . . that is not receiving [A.R.] into his home or the equivalent of it." "When [A.R.] was released from the hospital, he lived with the mother and did not live with [C.G.]." The court acknowledged that "[w]hile the mother and baby may have visited a few times with [C.G.]," he "never had the baby in his home without the mother." The court also noted that C.G. "[gave] inconsistent statements about his visitation prior to this case coming into dependency," he visited the mother and A.R. "in violation of the restraining order," "[h]e brought drugs to the mother at the House on the Hill," "and he allowed the mother to drive with [A.R.] while she was under the influence of methamphetamine."

11

The juvenile court continued that "[w]hile the standard is to be liberally construed, it must still demonstrate not the desire of a person to be a parent, . . . but an existing parental relationship." "While [C.G.] [has] visited consistently since protective custody, . . . this is not the type of parental relationship meant by [section] 7611(d), where the test requires that the parent receive the child into the home." The court acknowledged "that there are some cases which state that a child need not live with the parent for the parent to receive the child into their home," but found those cases distinguishable. "In one [of those cases], the father visited the child several times a month for four and a half years." "In another, the mother and child stayed with the father for weeks or months at a time, again, significantly more than the occasional overnight that [C.G.] testified to."

Finally, the juvenile court noted that C.G. "did not sign a voluntary declaration of paternity prior to getting the DNA results, although he could have." The court recognized that "through the visitation [C.G.] has developed some bond with [A.R.] and [A.R.] responds very positively to him . . . ." However, the court did not "believe [that] this is legally sufficient to meet the [statutory] standard" for presumed parent.

The juvenile court made alternative findings that even if C.G. was a presumed parent, then E.S. also qualified as a presumed parent for purposes of section 7612, subdivisions (b) and (c). The court proceeded to weigh each presumed parent's claim. With regard to C.G., the court found that while he "is a loving and consistent visitor and has chosen to take on a fatherly role towards [A.R.], he's never cared for [A.R.] outside the presence of the mother or outside the supervision of the hospital or the Department. He's seen him only for two hours at a time in the last five months and has not had primary care of him. It's not entirely clear why he wants to be a father to [A.R.], given that he's no longer in a relationship with the mother and has no biological ties to [A.R.] or to any of [A.R.'s] biological family on either side. While it's commendable that he has chosen to try and take on the role of father, and it's commendable that he has been a

12

consistent and loving presence to [A.R.], it is, I will say, somewhat surprising. It's not clear to me what societal interest would be served by having him remain as a father to [A.R.]. There's no nuclear family to preserve. He's no longer in a relationship with the mother, and he's never been in a full or primary parental role with respect to him. Allowing him to remain as a father would seem to me to be primarily for the benefit of [C.G.], as he wants to be [A.R.]'s father, rather than for [A.R.]'s benefit, which is what the Court must be concerned with."

As for E.S., the court found that while he did not have a well-established relationship with A.R. at this point, he had been "prevented from being involved in [A.R.]'s life and did not receive visitation until the DNA results were received. But since that time, he has remained steadfast in his desire to be a father to [A.R.], and he has been consistent and affectionate with him in visits. Given that he is the biological father who came forward as soon as he could and who has wanted to be a father, I think there are strong policy considerations in favor of maintaining this relationship." The court noted that while "biology is not controlling," "where neither father has a long or well-developed relationship with the child, I find biological does outweigh the desire of [C.G.] to be a father. And I, therefore, find that [E.S.]'s paternity is the one with the stronger claim both in policy and logic."

## II. Discussion

### A. Presumed Parent[4]

C.G. argues there was insufficient evidence to support the finding that he was not a presumed parent. Respondent E.S. contends that there was substantial evidence for the finding and urges this court to affirm the order. The Department has filed a letter brief in

---

[4] Effective January 2014, section 7611, subdivision (d) was amended to be gender neutral by referring to presumed parents, rather than presumed fathers. (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 773, fn. 10 (*R.M.*).) While some cases we cite and parts of the record refer to presumed fathers, we use the current operative language.

which it states, as it did in the juvenile court, it "[does] not intend to take a position in this appeal regarding the propriety of the juvenile court's parentage order."

### 1. *Standard of Review*

" 'The Uniform Parentage Act (UPA), Family Code section 7600 et seq., provides the statutory framework for judicial determinations of parentage, and governs private adoptions, paternity and custody disputes, and dependency proceedings.' " (*In re D.A.* (2012) 204 Cal.App.4th 811, 824.) With regard to paternity, the UPA distinguishes between " 'alleged,' " " 'biological,' " and " 'presumed' " fathers. (See *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 595-596.) "A man who may be the father of the dependent child but has not been established to be the natural or presumed father is an 'alleged father.' A man who has been established to be the biological father is a 'natural father.' A man who has held the child out as his own and received the child into his home is a 'presumed father.' " (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801, fns. omitted (*Jerry P.*).) "Presumed father status ranks highest." (*Ibid.*) Only a " 'statutorily presumed father' " is entitled to reunification services and custody of a child. (*Ibid.*)

Presumed parent status is governed by section 7611 of the UPA. In relevant part, a person is presumed to be the natural parent of a child if the person both receives the child into his home and openly holds the child out as his natural child. (§ 7611, subd. (d).) " ' " '[T]he statutory purpose [of section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.' " [Citation.] . . . "[T]he premise behind the category of presumed father is that an individual who has demonstrated a commitment to the child and the child's welfare . . . is entitled to the elevated status of presumed fatherhood." ' " (*Jason P. v. Danielle S.* (2017) 9 Cal.App.5th 1000, 1019.) Thus, "[a] person requesting presumed parent status under section 7611, subdivision (d) must have a 'fully developed parental relationship' with the child." (*In re M.Z.* (2016) 5 Cal.App.5th 53, 63 (*M.Z.*).)

14

"Presumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise.' " (*Jerry P*., *supra*, 95 Cal.App.4th at pp. 801-802.) To determine whether a person qualifies for presumed parent status, "courts have looked to such factors as whether the [person] actively helped the mother in prenatal care; whether he [or she] paid pregnancy and birth expenses commensurate with his [or her] ability to do so; whether he [or she] promptly took legal action to obtain custody of the child; whether he [or she] sought to have his [or her] name placed on the birth certificate; whether and how long he [or she] cared for the child; whether there is unequivocal evidence that he [or she] had acknowledged the child; the number of people to whom he [or she] had acknowledged the child; whether he [or she] provided for the child after it no longer resided with him [or her]; whether, if the child needed public benefits, he [or she] had pursued completion of the requisite paperwork; and whether his [or her] care was merely incidental." (*In re T.R*. (2005) 132 Cal.App.4th 1202, 1211.) The person claiming entitlement to presumed parent status has the burden of establishing, by a preponderance of the evidence, the facts supporting that entitlement. (*M.Z*., *supra*, 5 Cal.App.5th at pp. 64-65.)

On appeal, we review a finding regarding presumed parent status under the substantial evidence standard. (*M.Z*., *supra*, 5 Cal.App.5th at p. 64.) In applying this standard, "[w]e view the evidence in the light most favorable to the ruling, giving it the benefit of every reasonable inference and resolving all conflicts in support of the judgment. [Citation.] We defer to the trial court's credibility resolutions and do not reweigh the evidence. [Citation.] If there is substantial evidence to support the ruling, it will not be disturbed on appeal even if the record can also support a different ruling." (*R.M*., *supra*, 233 Cal.App.4th at p. 780.) Put another way, we must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the

evidence, would have supported a contrary ruling.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 168 (*N.M.*); *In re Manuel G.* (1997) 16 Cal.4th 805, 823.)

### 2. *Substantial Evidence Supports the Juvenile Court's Finding that C.G. Was Not a Presumed Parent*

C.G. argues that he "met his burden to demonstrate that he held A.R. out as his own, and had the familial relationship with A.R. protected by section 7611, subdivision (d)."  He argues that he "held A.R. out as his own from the moment he received the news that he had a son and called his family to tell them, and shared photos on social media."  He notes that he stayed with A.R. and the mother in the hospital, attended doctor's appointments, and purchased a number of necessary items for A.R.  He asserts that by "[u]sing terms of endearment toward A.R., and talking and singing with him, [he] 'entered into a familial relationship with the child' and showed his 'abiding commitment to the child and the child's well-being.' "  C.G. also contends that the court erroneously focused on whether A.R. actually resided with him.

Contrary to C.G.'s assertions, we conclude that substantial evidence supports the juvenile court's finding that he had not fully developed a parental relationship with A.R. and was therefore not entitled to presumed status under section 7611, subdivision (b).  Nor did the court erroneously focus on whether A.R. actually resided with C.G.

Here, viewed in the light most favorable to the ruling, there was sufficient evidence showing that C.G. and A.R. did not have a fully developed parental relationship.  The record reflects that C.G.'s visitation with A.R., while consistent, was relatively brief and almost entirely supervised.  Indeed, during an interview with the social worker on February 2, 2021, C.G. indicated there was some confusion about A.R.'s actual name, and noted he had not seen the child for approximately half a month.  As the juvenile court noted, C.G. gave inconsistent statements about the frequency and duration of A.R.'s presence in C.G.'s home prior to protective custody, with C.G. finally saying that A.R. only once spent the night at his house.  By not caring for A.R. in his own home, C.G.

16

"could avoid the constant parental-type tasks that come with having the child in his own home—such as feeding and cleaning up after the minor, changing [his] clothing, bathing [him], seeing to [his] naps, putting [him] to bed, taking [him] for outings, playing games with [him], disciplining [him], and otherwise focusing on the child." (*In re A.A.* (2003) 114 Cal.App.4th 771, 786-787.) C.G.'s relative lack of unsupervised visitation, especially in his own home, supported the juvenile court's adverse finding on whether C.G. had a fully developed parental relationship with A.R.

We also reject C.G.'s assertion that the juvenile court was unduly focused on whether A.R. actually resided in his home. In describing its findings, the court noted that sleeping at the hospital was "not receiving [A.R.] into his home *or the equivalent of it.*" (Italics added.) The court also acknowledged "that there are some cases which state that a child need not live with the parent for the parent to receive the child into their home," but then went on to describe why those cases were not applicable. In other words, the juvenile court clearly was aware that "there will be cases where the father cannot physically take the child into his home," and an alleged father should not be penalized on that basis alone. (*Jerry P.*, *supra*, 95 Cal.App.4th at p. 807.) That said, while we, like the juvenile court, do not give determinative weight to whether C.G. actually received A.R. into his home, the existence or nonexistence of such visits is nonetheless relevant to a presumed parent analysis. (See *In re D.M.* (2012) 210 Cal.App.4th 541, 549-550 (*D.M.*).)

Further, the evidence showed that C.G. brought the mother drugs while she was in residential treatment and allowed the mother to drive A.R. while she was under the influence of methamphetamine. With respect to allowing the mother to drive, C.G. stated he " 'didn't want her to get in trouble because [he thought] that she might change.[']" Section 7611, subdivision (d) "requires something more than a man's being the mother's casual friend or long-term boyfriend; he must be 'someone who has entered into a familial relationship with the child: someone who has demonstrated an abiding

17

commitment to the child and the child's well-being' regardless of his relationship with the mother." (*D.M.*, *supra*, 210 Cal.App.4th at p. 553.) These incidents endangered the minor and did not demonstrate an abiding commitment to A.R.'s well-being regardless of C.G.'s relationship with the mother. Viewed in the light most favorable to the ruling, these incidents supported the determination that C.G. did not have a fully developed parental relationship with A.R.

Finally, although C.G. asserts that he attempted to do everything possible to attempt to gain custody through all legal means, the evidence on this point suggests that he did not. C.G. did not sign a voluntary declaration of paternity despite being with A.R. and the mother for two weeks at the hospital. Nor did he make an effort to have his name on A.R.'s birth certificate. C.G. indicated that he did not seek to have his name on the birth certificate because of the no contact restraining order, but he also admitted that the same restraining order did not prevent him from being at the hospital with the mother. The apparent lack of effort to have his name added to A.R.'s birth certificate supported the juvenile court's finding that C.G. was not a presumed parent. (See *In re Sarah C.* (1992) 8 Cal.App.4th 964, 973 [finding sufficient evidence to support finding that appellant was not presumed father, in part, because "there was also evidence indicating he never sought to have himself listed on [the minor's] birth certificate as her father"].) Although C.G. explained that he was never given a voluntary declaration of paternity, the court was not required to believe his testimony, especially in light of C.G.'s inconsistent testimony on other issues.

In sum, under the applicable standard of review, there was substantial evidence to support the juvenile court's finding that C.G. was not a presumed parent. Although there may be evidence supporting a contrary finding, we must affirm the court's findings where there is substantial evidence, even if other evidence, or other inferences from the

18

evidence, would have supported a contrary ruling.[5]  (*N.M.*, *supra*, 197 Cal.App.4th at p. 168.)

### III.  Disposition

The juvenile court's order finding that C.G. was not a presumed parent is affirmed.

---

[5] Because the juvenile court's presumed parent finding was supported by substantial evidence, we need not address C.G.'s other arguments on whether a three-parent finding was appropriate or whether, under the weighing process of subdivision (b) of section 7612, his or respondent E.S.'s status should control.  (See *M.Z.*, *supra*, 5 Cal.App.5th at p. 66.)  We also do not address C.G.'s challenge to E.S.'s presumed parenthood, as he does not have standing to do so.  (See *In re Vanessa Z.* (1994) 23 Cal.App.4th 258, 261; *In re Frank L.* (2000) 81 Cal.App.4th 700, 703.)

_____
                                    Wilson, J.

WE CONCUR:

_____
        Bamattre-Manoukian, Acting P.J.

_____
                 Danner, J.

In re A.R.; DFCS v. C.G.
H049342